Matthew R. Mendelsohn
David A. Mazie
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: (973) 228-9898
Facsimile: (973) 228-0303

Attorneys for Plaintiffs and Plaintiff Classes

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LYNETTE BOURNE-MILLER, VICTOR FERRER, ROBERT HARE, PAUL PUGLIESE, AND DARREN BAILEY, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BMW OF NORTH AMERICA, LLC, and BMW Aktiengesellschaft,<br><br>Defendants. | Civil Action No. 2:11-cv-6909 (FSH) (PS)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs Lynette Bourne-Miller, Victor Ferrer, Robert Hare, Paul Pugliese, and Darren Bailey (collectively, "Plaintiffs"), bring this action against Defendants BMW of North America, LLC ("BMW NA") and BMW Aktiengesellschaft ("BMW AG") (collectively, "BMW"), by and through their attorneys, individually and behalf of all others similarly situated ("Class Members"), and allege as follows:

### INTRODUCTION

1.     Plaintiffs Lynette Bourne-Miller, Victor Ferrer, Robert Hare, Paul Pugliese, and Darren Bailey (collectively, "Plaintiffs"), bring this action individually and on behalf all

persons in the United States (excluding residents of the State of California or any individuals who purchased or leased a Mini in California) who purchased or leased any 2002 through 2006 Mini or 2005 through 2008 Mini Convertible vehicles equipped with a continuously-variable transmission (collectively, "Class Vehicles") designed, manufactured, distributed, sold, marketed, advertised, warranted and serviced by BMW NA and BMW AG (collectively, "BMW" or "Defendants").

2.       Beginning in 2002, if not before, Defendants knew or should have known that the Class Vehicles and their continuously variable transmission ("CVT") contain one or more design and manufacturing defects that causes them to prematurely breakdown and suffer mechanical failure ("CVT Defect").

3.       A CVT is a type of automatic transmission that allegedly provides more useable power, better fuel economy and a smoother driving experience than a traditional automatic transmission.  Unlike traditional transmissions with a gearset, a CVT uses a system of pulleys with a metal belt or chain running between them which enables the engine to run at its most efficient revolutions per minute (RPM) for a range of vehicle speeds.

4.       When said premature breakdown and mechanical failure occurs, the affected Class Vehicles are no longer safe to operate and require repairs costing several thousand dollars.  Furthermore, due to the nature of the CVT Defect, consumers have frequently experienced and will continue to experience unexpected and premature CVT failure while driving.  CVT failure while driving results in unsafe conditions, including but not limited to transmission slips, loss of forward propulsion, significant delays in acceleration, loud noises coming from the CVT, and total transmission failure while driving.

5.       These conditions present a safety hazard because the CVTs can fail, suddenly

and unexpectedly, at any time and under any driving condition or speed, thereby contributing to traffic accidents, which can result in personal injury or death.

6.     Since 2002, if not before, BMW knew or should have known that the CVTs were defectively designed, assembled, and manufactured.  Rather than alerting Class Members of this safety hazard and offering to repair the Class Vehicles, BMW has concealed this problem from its customers at the time of purchase or lease and thereafter.

7.     Because BMW will not notify Class Members that the CVT is defective, Plaintiffs and Class Members (as well as members of the general public) are subjected to dangerous driving conditions that often occur without warning.  As a result of the CVT Defect, BMW through its dealers has also profited by selling replacement parts to Class Members.

8.     The CVT is an option on the Class Vehicles.  The Mini Cooper vehicles included in the definition of Class Vehicles all come equipped with CVTs.  Had Plaintiffs and the other Class Members at the time of purchase or lease known about the defects contained in the Class Vehicles and their CVTs, the associated monetary repair costs and/or safety hazards, they would not have paid extra for this defective option, would not have purchased the Class Vehicles, or would have paid less for them.

9.     Plaintiffs are informed and believe and based thereon allege that as the number of consumer complaints about the CVT Defect increased, between 2004 to 2009, Defendants issued several technical service bulletins ("TSB") to only its dealers acknowledging the CVT Defect for Class Vehicles and implemented several fixes that failed to repair the problem.

10.    Plaintiffs are informed and believe and based thereon allege that despite notice of the defect from numerous consumer complaints and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the defect, have not offered its customers a

suitable repair or replacement free of charge, and have not offered to reimburse the Class Vehicles' owners and leaseholders the costs they incurred relating to diagnosing and repairing the CVT Defect and the related damage that it causes.

11.     BMW knew and concealed the CVT Defect that is contained in every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and Class Members both at the time of sale and repair and thereafter.  Had Plaintiffs and the Class Members known about this defect at the time of sale or lease, Plaintiffs and the Class Members would not have purchased the Class Vehicles or would have paid less for them. As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

12.     Additionally, as a result of the CVT Defect contained in the Class Vehicles, Plaintiffs and the Class Members have been harmed and have suffered actual damages in that the Class Vehicles and their CVTs have failed or are substantially certain to fail during their expected useful life.

<u>**JURISDICTION AND VENUE**</u>

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants BMW NA and BMW AG have their North American headquarters in this jurisdiction, transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district.   Additionally, Defendants made the decision(s) to withhold material information about the CVT Defect from the Class Members in this District.  Finally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

15.     This Court has personal jurisdiction over Defendants BMW NA and BMW AG. Defendants' North American corporate headquarters is located in Woodcliff Lake, New Jersey. As such, Defendants have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

## APPLICABLE LAW

16.     New Jersey state law applies to all claims brought on behalf of all Nationwide Class Members.  If, however, the Court decides that New Jersey state law only applies to New Jersey Class Members, then the Court should apply the state law of the various Statewide Sub-Classes (defined below with reference to ¶ 77).

## PARTIES

**PLAINTIFF LYNETTE BOURNE-MILLER**

17.     Plaintiff Lynette Bourne-Miller is a South Carolina citizen who resides in Mt. Pleasant, South Carolina.  On or about October 10, 2003, Plaintiff purchased a 2004 Mini Cooper from Rick Hendrick BMW in Charleston, South Carolina.

18.     Plaintiff purchased her vehicle primarily for her personal, family, or household purposes.   The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by defendants, and bears the Vehicle Identification No. WMWRC33464TJ53465.

19.     With around 21,000 miles on the vehicle's odometer, Plaintiff began to experience CVT issues, namely the CVT getting stuck in one position when driven at approximately 50-60 mph causing the RPM's to rise.

20.     On January 31, 2006, with approximately 21,957 miles on the odometer, Plaintiff took her vehicle to BMW dealer, Rick Hendrick BMW, complaining that the "motor seems to rev at 55mph" and that the "RPMs go way up."  The BMW dealer reprogrammed the vehicle's DME engine computer, cleared adaptation values in the CVT, performed a clutch adaptation, and set up the ratio adaption.

21.     The repairs performed on plaintiff's vehicle were only temporary repairs and did not actually repair the defect in material and/or workmanship as BMW was required to do under the New Vehicle Limited Warranty.  Plaintiff next experienced problems with the CVT again on or around July 2008.

22.     On July 14, 2008, with approximately 38,459 miles on the odometer, Plaintiff took her vehicle to BMW dealer, Rick Hendrick BMW, complaining that "at 35 or 55 MPH the RPM's will rev." The BMW dealer reprogrammed the vehicle's DME engine computer again, and readapted the CVT.   The cost of the service was covered under the vehicle's express warranty.

23.     However, once again, the BMW dealer implemented temporary repair that was meant to mask the defect for a period of time and did not repair or replace the defective CVT under warranty as they were required to do.   Plaintiff next experienced problems with the

CVT again on or around January 2011.

24.     On January 31, 2011, with approximately 53,119 miles on the odometer, Plaintiff took her vehicle to BMW dealer, Rick Hendrick BMW, again complaining that the CVT "doesn't upshift to the highest gear." The BMW dealer stated that they "found transmission slippage at 60 MPH range and trans will not shift further." The BMW dealer informed Plaintiff for the first time that the CVT needed to be replaced at a cost of $7,340.00 and that the replacement would not be covered under warranty. Because BMW refused to pay the entire cost of repair, Plaintiff did not repair her transmission.

25.     As a result, Plaintiff has been left with a vehicle with a transmission that does function properly. As a result of the CVT defect, plaintiff is no longer able to fully use her vehicle. In fact, plaintiff tries to limit the use of her vehicle whenever possible and will not use her vehicle when she needs to travel any sort of distance for fear that the CVT will suffer a catastrophic failure during the drive. Plaintiff has also been left with a vehicle that is worth substantially less because of the defective transmission that needs to be replaced.

26.     At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**PLAINTIFF VICTOR FERRER**

27.     Plaintiff Victor Ferrer is a New Jersey citizen who resides in Wayne, New Jersey. On or about April 29, 2005, Mr. Ferrer purchased a new 2005 Mini Cooper Convertible from Prestige Mini in Ramsey, New Jersey.

28.     Mr. Ferrer purchased his vehicle primarily for his personal, family, or household purposes. The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRF33575TG12796.

29.     With approximately 63,000 miles on the vehicle's odometer, Mr. Ferrer began to experience problems with his CVT, namely transmission slips.  On August 19, 2009, with approximately 63,000 miles on the odometer, Mr. Ferrer took his vehicle to Prestige Mini, complaining that the CVT was slipping.   Initially, the dealer told Mr. Ferrer that the transmission was fine; however, after leaving the dealer his vehicle automatically went into "emergency mode" and was unable to shift beyond 2nd gear.  Mr. Ferrer returned to the dealer. The dealer verified Mr. Ferrer's concerns and advised him that he would require a new transmission.

30.     On August 21, 2009, Mr. Ferrer's transmission suffered a complete failure while Mr. Ferrer was driving on the highway.  Mr. Ferrer's inoperative vehicle was towed to Prestige Mini, who informed Mr. Ferrer that he would have to pay $6,999.95 to repair the defective transmission because his vehicle was no longer covered under the manufacturer's warranty.

31.     Therefore, on August 21, 2009, with 65,368 miles on the odometer, Mr. Ferrer paid $6,999.95 for a replacement CVT.  However, not long after the CVT was replaced, Mr. Ferrer's vehicle began to lag and suffer gear slips once again.

32.     At all times, Mr. Ferrer, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**PLAINTIFF ROBERT HARE**

33.     Plaintiff Robert Hare is a Kentucky citizen who resides in Florence, Kentucky. On June 11, 2002, Mr. Hare purchased a new 2002 Mini Cooper from Mini dealer, Cincinnati Mini, in Cincinnati, Ohio.

34.     Mr. Hare purchased his vehicle primarily for his personal, family, or household purposes.   The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRC33472TE10892.

35.     With approximately 65,000 miles on the vehicle's odometer, Mr. Hare began to experience problems with his CVT, namely clunking noises from the transmission.

36.     On May 17, 2011, with 68,523 miles on the odometer, the CVT failed completely, rendering Mr. Hare's vehicle inoperative.   Mr. Hare had the vehicle towed to Cincinnati Mini and advised them that his CVT had been making clunking noises and that the vehicle would not go anywhere when in gear.   Cincinnati Mini informed Mr. Hare that the CVT needed to be replaced at a cost of $10,488.30.   Mr. Hare declined to repair the transmission at that price.

37.     On May 19, 2011, Mr. Hare had his vehicle towed to Ridge Transmissions Inc., an independent transmission mechanic. Mr. Hare paid $7,439.02 for a replacement 2002 CVT Transmission.

38.     Unfortunately, the replacement CVT failed shortly after it was installed.  Ridge Transmissions then replaced Mr. Hare's CVT for a second time with a newer model CVT.

39.     At all times, Mr. Hare, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**PLAINTIFF PAUL PUGLIESE**

40.     Plaintiff Paul Pugliese is a Connecticut citizen who resides in Greenwich, Connecticut.  On May 12, 2007, Mr. Pugliese purchased a used 2005 Mini Cooper from Mini dealer, Felix F. Callari, Inc. d/b/a MINI of Fairfield County in Stamford, Connecticut.

41.     Mr. Pugliese purchased his vehicle primarily for his personal, family, or household purposes.  The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRE33515T696472.

42.     With approximately 70,000 miles on the vehicle's odometer, Mr. Pugliese began to experience problems with his CVT, namely gear slips and bucking movements.

43.     On August 10, 2011, with 74,083 miles on the odometer, Mr. Pugliese brought his vehicle to Mini of Fairfield County and advised that his vehicle had been exhibiting gear slips. Mini of Fairfield conducted a transmission inspection at a cost of $130.00, finding that the transmission "STARTED TO SHIFT REALLY BAD ONCE VEH GOT HOT" and that the vehicle "WILL NEED A NEW TRANSMISSION." Mini of Fairfield quoted Mr. Pugliese approximately $6,800 for a replacement transmission.  Mr. Pugliese declined to repair the transmission at that price but paid $130 for the diagnosis.

44.      Following the trip to the dealership, Mr. Pugliese's vehicle continued to exhibit gear slips and bucking movements at a worsening rate.  Mr. Pugliese's vehicle is now inoperable.

45.     At all times, Mr. Pugliese, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**PLAINTIFF DARREN BAILEY**

46.     Plaintiff Darren Bailey is an Illinois citizen who resides in Xenia, Illinois.  He owns a 2002 Mini Cooper which he purchased used on Ebay in 2008 with 20,000 miles on the odometer.

47.     Mr. Bailey purchased his vehicle primarily for his personal, family, or household purposes.  The vehicle was manufactured, sold, distributed, advertised, marketed,

and warranted by defendants, and bears the Vehicle Identification No. WMWRC33482TE11369.

48.     With approximately 64,000 miles on the odometer, as Mr. Bailey was driving, his vehicle abruptly decelerated.  The transmission began to jerk the vehicle violently and would not propel the vehicle above 10 mph.

49.     On or about October 14, 2011, Mr. Bailey took his vehicle to Mini dealer, Mini of St. Louis, in Clayton, Missouri, complaining that the vehicle "will not drive over 10 mph" and that the transmission was "jerking on acceleration."  The Mini dealer found metal flakes in the transmission fluid and informed Mr. Bailey that his transmission would need to be replaced at a cost of approximately $8,500.  Because BMW refused to pay the entire cost of repair, Mr. Bailey declined the repair at that time.   Mr. Bailey paid $123.71 for the inspection and diagnosis.

50.      On January 9th, 2012, Mr. Bailey purchased a used CVT from Modern Imports in St. Louis Missouri for $3,254.73.  On or about January 23, 3012, local mechanic Greg Ritter of Ritter's Auto, in Kinmundy, Illinois, installed the transmission.  Despite the replacement, Mr. Bailey's vehicle continues to suffer from gear slips, stalls, and loss of power.

51.     At all times, Mr. Bailey, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**DEFENDANTS**

52.     Defendant BMW NA is a corporation organized and in existence under the laws of the State of Delaware and registered to do business in New Jersey.  BMW NA's Corporate Headquarters is located in Woodcliff Lake, New Jersey.  BMW NA imports, distributes, sells/leases, warrants and services the Class Vehicles in the United States.

53.     Defendant BMW AG, a foreign corporation organized and in existence under the laws of the Federal Republic of Germany with its principal place of business at Petuerling 130, 80809 Munich, Germany.  BMW AG designs, manufactures, exports, and warrants motor vehicles, parts, and other products for sale in United States and for export and sale throughout the world.

54.     At all times relevant herein, Defendants are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in New Jersey and throughout the United States of America.

## TOLLING OF STATUTES OF LIMITATION

55.     Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and Class Members could not have reasonably discovered the true, defective nature of the CVT Defect until shortly before this class action litigation was commenced.

56.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles, that the CVT Defect is based on defects in materials and/or workmanship, and that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles.  As a result of Defendants failure to disclose and/or active concealment, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

57.     For years, Defendants have designed, manufactured, distributed, sold, and leased the Class Vehicles.  Defendants have sold, directly or indirectly, through dealers and

other retail outlets, thousands of Class Vehicles equipped with the CVT nationwide.

58.     This lawsuit concerns vehicles that are equipped with a factory-installed CVT.

59.     Conventional automatic transmissions have a finite number of gears, usually between three and six.  The appropriate gear is automatically selected by the vehicle based on several factors, including vehicle speed, engine revolutions per minute, incline/decline of the vehicle, and vehicle throttle.

60.     By contrast, a continuously variable transmission, *i.e.*, "CVT" [1] uses two pulleys and a drive belt that connects the pulleys to each other.  The pulleys automatically adjust themselves to different circumferences by increasing or decreasing the circumference of one pulley, and simultaneously decreasing or increasing, respectfully, the circumference of the other pulley.  The concept behind operation of the CVT is that the transmission never disengages in order to change the transmission's gear ratio, and that the transmission is capable of adjusting to a very broad number of gear ratios in order to find a suitable ratio for the particular driving circumstances.

61.     In 2002, BMW brought Class Vehicles with CVTs installed to the market after decades of the Mini Coopers being out of production. Unfortunately, the CVT was plagued with numerous defects.  These defects resulted in functional failure and sometimes catastrophic failure of the CVT.

62.     Dating back to 2002, BMW was aware of the defects of the CVT.  BMW, however, failed and refused to disclose these known defects to consumers.  As a result of this failure, Plaintiffs and Class Members have been damaged.

---

[1] Some alleged potential benefits of CVT transmissions are that they provide more useable power, better fuel economy and a smoother driving experience than a traditional automatic transmission.

A.    **The CVT Transmission Defect Poses an Unreasonable Safety Hazard**

63.    The Class Vehicles have habitually suffered CVT failures while in traffic, creating a very serious safety hazard.  These failures often result in transmission slips, loss of forward propulsion, acceleration surging, significant delays in acceleration and total transmission failure.

64.    Defendants had a duty to disclose the CVT Defect to Class Members because the defect resulted an unsafe condition during the operation of the vehicle.  The CVT Defect eventually results in catastrophic failure of the transmission and its related components.  If this catastrophic failure occurs while the vehicle is in operation it can result in a major safety concern for the occupants of the Class Vehicles and all other vehicles on the road.  Specifically, the vehicle could lose forward propulsion, could result in the vehicle coming to a grinding halt, or prevent a driver from being able to safely maneuver their vehicle to the side of the road.  Moreover, a damaged transmission could result in a vehicle not being able to be put into "Park."  Any of these issues could cause a motor-vehicle accident and result in personal injuries or death.

65.    Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced problems with the CVT.  Complaints filed by consumers with the National Highway Traffic Safety Administration ("NHTSA") and posted on the internet demonstrate that the defect is widespread and dangerous, expensive to repair, and that it manifests without warning.  The complaints also indicate Defendants' awareness of the problems with the CVT, the costs associated with the necessary repairs, and how potentially dangerous the defective condition is for consumers.  The following are some safety complaints relating to the CVT Defect (spelling and grammar mistakes remain as found in the original):

**NHTSA Complaints:**

- 2002 MINI COOPER. I WAS DRIVING FROM EAST LOS ANGELES TO WEST LOS ANGELES (PLAYA DEL RAY) ON THE 105 WEST HGWY WHEN THE CARS TRANSMISSION WENT OUT. THIS HAPPENED IN THE MIDDLE OF THE FREEWAY IN LA DURING RUSH HOUR. I HAD TO SLOWLY MOVE OVER TO THE RIGHT HAND SIDE OF THE HIGHWAY UNTIL I COULD FIND AN AREA WITH A SHOULDER. I BARELY MADE IT TO THE SHOULDER AND COULD HAVE DIED FROM ONE OF THE CARS SPEEDING PAST ME. LUCKILY I MADE IT. I CALLED AAA AND THEY BROUGHT A TOW TRUCK WHICH TOWED THE CAR INTO A SHOP WHICH STATED THAT THEY WOULD NOT BE ABLE TO REBUILD THE TRANSMISSION. THEY SAID I WOULD HAVE TO REPLACE THE WHOLE THING WHICH WOULD COST $7,000 MINIMUM. I CALLED MULTIPLE OTHER DEALERS AND SHOPS, WHOM ALL GAVE THE SAME ESTIMATE. I DONATED IT TO MY LOCAL NPR STATION BECAUSE I DID NOT WANT TO PAY THAT AMOUNT OF MONEY TO REPLACE A FAULTY TRANSMISSION, WITH ANOTHER FAULTY TRANSMISSION.

- I ALWAYS MAINTAINED MY 2002 MINI COOPER AND AT 80K MILES THE TRANSMISSION BLEW UP JUST BEFORE I WAS TO ENTER A VERY BUSY FREEWAY IN LOS ANGELES, DOWNTOWN AREA. THERE WAS PLENTY OF OIL IN THE TRANSMISSION. I WAS TOLD IT WAS NOT A FAULT OF MY CARE AFTER THE MECHANIC LOOKED AT IT UPON TOW IN. IT JUST STOPPED FAST AND SHORT WITH A HUGE JERK FORWARD AND EXPLOSIVE NOISE. THE MECHANIC SAID IT BLEW IN BIG CHUNKS. I COULDN'T MOVE IT FROM TRAFFIC IN NEUTRAL AND HAD IT TOWED TO THE SHOP. 80K IS EARLY FOR SOMETHING LIKE THIS AND I SEE MANY PEOPLE ARE REPORTING THIS HAPPENED WITH EVEN LESS MILEAGE, 34K, 48K ...NO REPLACEMENTS AND SO MANY FAILURES LIKE THIS? MINI TURNS THEIR HEADS; WOULD NOT REPLACE OR EVEN TALK TO ME. PREVIOUSLY TOO THE POWER STEERING PUMP ALSO JUST STOPPED AND NO MOVEMENT ON THE WHEEL. SERIOUSLY DANGEROUS. I WAS TOLD BY THE DEALERSHIP ONE TIME IN MOUNTAIN VIEW, I HAD AN OIL LEAK. AT THE TIME THE AMOUNT THEY WANTED ME TO PAY WAS HIGH, 700.00 OR SO (JUST AFTER WARRANTY ENDED). I TOOK IT TO ANOTHER MECHANIC. HE TOOK ME UNDER THE CAR AND SHOWED ME THERE WAS NOT A SPOT OF OIL UNDER THAT CAR IN ANY NOOK OR CRANNY. IN THINKING ABOUT THIS AFTER TRANSMISSION PROBLEM I REALIZE THESE THINGS ARE TELLING ME MINI KNOWS ABOUT THEIR MINI MECHANICAL PROBLEMS. ALSO WHEN THE NEW ($4350.00) TRANSMISSION WAS PURCHASED, LA, MINI TOLD THE MECHANIC THEY HAD 5 TRANSMISSIONS IN STOCK IN THEIR PARTS DEPARTMENT AT ALL TIMES BECAUSE THIS WAS SO COMMON. THAT'S PROOF THEY KNOW IT'S A PROBLEM. YET NO RECALL TO PEOPLE WITH THESE ISSUES AND THESE CAN CAUSE SERIOUS LIFE THREATENING PROBLEMS. *TR

- TL*THE CONTACT OWNS A 2002 MINI COOPER. THE VEHICLE SHUT OFF

WHILE DRIVING APPROXIMATELY 25 MPH. THERE WERE NO WARNINGS PRIOR TO THE TRANSMISSION FAILURE. THE CONTACT FEELS THAT THIS IS A SERIOUS SAFETY ISSUE BECAUSE A CRASH COULD HAVE OCCURRED. THE FAILURE MILEAGE WAS 63,000.

- TRANSMISSION WHINING NOISE EVENTUALLY LEADING TO TRANSMISSION FAILURE. MINI IS AWARE OF THIS PROBLEM WITH CVT TRANSMISSIONS AND REFUSES TO ADMIT FAULT. VERY COMMON PROBLEM OCCURRING IN MOST 2002 VEHICLES WITH ONLY 40,000-60,000 MILES ON THEM. COST IS 7000 TO REPLACE. MINI DOES NOT OFFER REPAIR ON THIS PART. *TR

- MY 2003 MINI COOPER HAS HAD TOTAL TRANSMISSION FAILURE (CVT TRANSMISSION) AT ONLY 46,129 MILES. FAILURE WAS TOTAL AND SUDDEN AND VEHICLE IS UNDRIVEABLE WITHOUT NEW TRANSMISSION. THE DEALER QUOTED ME A COST OF $10,055.44 (PARTS $6,943.28, LABOR $2,700 + TAX). THIS COST IS MORE THAT THE VEHICLES' CURRENT VALUE. I HAVE BEEN TOLD THAT ONLY A NEW CVT TRANSMISSION CAN REPLACE THE FAULTY ONE, AND EVEN THEN THAT TRANSMISSION MAY AGAIN FAIL AS THEY ARE SUCH TERRIBLE TRANSMISSIONS. THE CAR WILL NOT TAKE ANY OTHER TRANSMISSION OPTION. THE DEALER BASICALLY LAUGHED AND SAID, "I DON'T SUPPOSE YOU HAVE AN EXTRA $10,000 LAYING AROUND," WHEN HE TOLD ME THE COST OF THE REPAIR. THE DEALER HAS OFFERED NO ASSISTANCE IN LOWERING THE COST, BUT BASICALLY SAID "TOUGH LUCK" AND TAKEN NO RESPONSIBILITY. THE CAR IS USELESS AND UNFIXABLE AT THIS COST. A RECALL SHOULD BE DONE AS CONSUMERS HAVE BEEN SOLD A FAILED TRANSMISSION, AND THE SAFETY OF THIS CAR'S TRANSMISSION IS TOTALLY FAULTY. *TR

- I OWN A 2003 MINI COOPER WITH A CVT AUTOMATIC TRANSMISSION, TRANSMISSION AND FRONT DIFFERENTIAL FILED AT 58000 MILES LUCKY FOR ME I WAS NOT ON THE INTERSTATE OR BUSY TRAFFIC AS A SERIOUS ACCIDENT COULD HAVE OCCURRED. MINI USA ARE TOTALLY AWARE OF THE PROBLEM AND STOPPED PUTTING THIS DEFECTIVE PART IN NEWER MODEL VEHICLES. THEY WILL ALSO NOT STAND BEHIND THEIR PRODUCT AND ARE UNWILLING TO RECTIFY IT. THERE ARE HUNDREDS OF PEOPLE WITH THIS SAME ISSUE CONCERNING THIS TRANSMISSION BUT FOR WHATEVER REASON THERE IS STILL NO SAFETY RECALL. I HOPE IT IS NOT GOING TO TAKE SOMEONE TO BE KILLED OR SERIOUSLY INJURED BEFORE ANYTHING IS DONE. ALSO THE BUSHINGS ON THE DRIVERS SIDE A FRAME ARE BAD WCH IN MY OPINION IS A SERIOUS FAULT AND COULD BE EXTREMELY DANGEROUS. COST OF REPLACEMENT IS 7,000+ THESE CARS ARE ROLLING DEATH TRAPS IN MY OPINION AND SOMEONE NEEDS TO BE HELD ACCOUNTABLE. *LN

- I HAVE A 2004 MINI COOPER WITH 87,000 MILES ON IT. THERE WERE NO EVENTS LEADING UP TO THE TOTAL CVT TRANSMISSION FAILURE THAT TOOK PLACE LAST FRIDAY 07/29/11. I WAS ENTERING INTO A LARGE INTERSECTION WHEN THE CAR STARTED BUCKING AND RATTLING. I JUST MADE IT INTO A HESS STATION PARKING LOT (THANK GOODNESS THERE WAS ONE THERE) WHEN IT WOULDN'T GO ANY FURTHER. I HAD IT TOWED TO A LOCAL TRANSMISSION SHOP AND THEY SAID THAT THE TRANS WAS DEAD AND I WAS GOING TO NEED A NEW ONE. THEY INFORMED ME THAT THERE AREN'T ANY REBUILT OPTIONS AND THE NEW TRANS IS GOING TO COST ME $5000 + $1200 FOR LABOR. I HAVE DONE A BUNCH OF RESEARCH ON THESE CVT TRANSMISSIONS AND APPARENTLY THEY HAVE BEEN A HUGE PROBLEM AND BMW/MINI HAVEN'T DONE ANYTHING ABOUT IT. I THINK IT IS A DISGRACE THAT THIS CONTINUES TO HAPPEN AND COST PEOPLE THOUSANDS OF DOLLARS. SOMETHING NEEDS TO BE DONE ASAP!!!!

- TL*THE CONTACT OWNS A 2004 MINI COPPER. THE CONTACT WAS DRIVING 55 MPH IN ORDER TO PASS ANOTHER VEHICLE WHEN THE TRANSMISSION FAILED AND MADE IT DIFFICULT TO INCREASE SPEED. THE CONTACT TOOK THE VEHICLE TO THE DEALER SEVERAL TIMES PRIOR TO THE TRANSMISSION FAILING AND WAS TOLD TO ONLY USE PREMIUM GASOLINE. THE CONTACT MADE THE CHANGE AND WITHIN A FEW MONTHS, THE TRANSMISSION FAILED. THE FAILURE AND CURRENT MILEAGES WERE 58,000.

- 2004 MINI COOPER. CVT TRANSMISSION REPLACEMENT RECOMMENDED. *TGW ONE DAY WHILE DRIVING ON THE HIGHWAY, THE VEHICLE JUST STOPPED; DEAD NO POWER. THE CONSUMER STATED THE VEHICLE IS SITTING IN THE GARAGE UN-DRIVABLE BECAUSE SHE DOESN'T HAVE THE $8,000 TO REPLACE THE CVT TRANSMISSION. *JB

- MY 2004 MINI COOPERS TRANSMISSION FAILED AT 80K MILES WITH NO WARNING. LUCKILY I WAS IN A PARKING LOT AND NOT ON THE HIGHWAY, WHERE I COULD HAVE BEEN KILLED. THE COST OF REPLACING THE TRANNY WAS $7,000. MINI USA WAS USELESS WHEN I PLEADED WITH THEM TO HELP ME. AFTER READING ABOUT ALL OF THE OTHER COMPLAINTS WITH THE CVT TRANS, I CAN'T BELIEVE THERE WAS NO RECALL. I WILL NEVER BUY A MINI AGAIN. I STILL OWE $11,000 ON THE CAR AND CANNOT AFFORD ANOTHER. *TR

- 2005 MINI COOPER AUTOMATIC CVT TRANSMISSION FAILED AT ONLY 47,000 MILES. WHEN TAKING MY FOOT OFF OF THE GAS, THE RPM'S WOULD REV UP AS THE CAR SLOWED DOWN. THEN MY CHECK ENGINE LIGHT AND EP (TRANSMISSION) WARNING LIGHT CAME ON AND THE CAR WOULD NO LONGER SHIFT ABOVE SECOND GEAR,

MAKING THE CAR PRACTICALLY UNDRIVABLE. THIS VEHICLE HAS ALWAYS BEEN SERVICED PROMPTLY AND WELL MAINTAINED THROUGH MINI COOPER DEALERSHIPS. MY FACTORY WARRANTY EXPIRED 6 MONTHS AGO. THE INTERIOR BELT OR CHAIN ON THE TRANSMISSION HAS "COMPLETELY COME APART" AND THE ENTIRE TRANSMISSION NEEDS TO BE REPLACED. MINI COOPER ESTIMATES $7600 TO REPLACE THIS TRANSMISSION! *TR

- TL*THE CONTACT OWNS A 2005 MINI COOPER. WHILE DRIVING 25 MPH, THE VEHICLE JERKED AND MADE RATTLING AND POPPING SOUNDS. THE VEHICLE SHUT OFF AND THE CONTACT PUSHED IT TO THE SIDE OF THE ROAD. THE KEY COULD NOT BE REMOVED FROM THE IGNITION AND THE VEHICLE HAD TO BE TOWED TO THE DEALER. SHE WAS INFORMED THAT THE TRANSMISSION FAILED AND WOULD COST $7,000 TO REPAIR. THE CONTACT WILL CALL THE MANUFACTURER FOR ASSISTANCE. THE FAILURE MILEAGE WAS 62,000.

- I HAD MY BRAND NEW 2005 MINI COOPER S AUTOMATIC FOR LESS THAN ONE MONTH WHEN IT STALLED IN THE MIDDLE OF THE STREET - THE ENGINE JUST STALLED OUT OR WENT INTO WHAT I'VE BEEN TOLD IS "LIMP MODE". LUCKILY, THE STREET WASN'T CROWDED AND I WAS ABLE TO COAST TO THE SIDE OF THE ROAD. BUT WHAT IF I WAS ON THE FREEWAY???? I'VE SUBSEQUENTLY FOUND OUT MANY PEOPLE HAVE HAD THE SAME PROBLEM AND BMW KNOWS ABOUT IT, BUT HASN'T BEEN ABLE TO FIX THE PROBLEM CORRECTLY. I BELIEVE THIS IS A HUGE SAFETY ISSUE! BMW SAID IT IS A SOFTWARE PROBLEM AND THEY HAVE MADE UPDATES, BUT I DON'T BELIEVE IT HAS BEEN CORRECTED. I AM STILL AFRAID TO DRIVE ON THE FREEWAY FOR FEAR OF BECOMING A STATISTIC! BMW SHOULD AT LEAST NOTIFY ALL MCS AUTOMATIC OWNERS OF THE POTENTIAL HAZARD! *JB

- HI, I'M WRITING TO REPORT THAT MY 2005 MINI COOPER, WITH LESS THAN 43K MILES IS IN NEED OF A THIRD TRANSMISSION. I NEARLY DID NOT MAKE IT HOME ONE EVENING BECAUSE THE JERKING MOTION THE CAR WAS MAKING AND BECAUSE THE ENGINE JUST FELT LIKE IT WAS GOING TO SHUT OFF. I NEARLY STALLED ON THE HIGHWAY, WHILE IN TRAFFIC. THE FIRST TRANSMISSION, WHILE UNDER WARRANTY WAS REPLACED IN NOVEMBER 2007 AT 28K MILES. ON 12/16/08, I HAD AN ACCIDENT WHERE THE TRANSMISSION PAN AMONG OTHER THINGS HAD TO BE REPLACED. IT WAS THE ONLY KNOWN DAMAGE CAUSED TO THE TRANSMISSION. THE AUTO BODY AND PAINT SHOP THAT I CONTRACTED WITH DID NOT KNOW HOW TO FILL THE TRANSMISSION FLUID AND THEREFORE THE CAR HAD TO BE TOWED THE LOCAL MINI COOPER DEALERSHIP. THEY PERFORMED THAT PIECE OF IT. NOW, THE DEALER IS TELLING ME I NEED A NEW

TRANSMISSION AND THE CAR IS OUT OF WARRANTY. THE DEALERSHIP ALSO STATES THEY DON'T KNOW IF THE TRANSMISSION DAMAGE WAS A RESIDUAL OF THE ACCIDENT OR NOT AND THEREFORE, WERE TRYING TO OPEN UP THE OLD INSURANCE CLAIM FROM JANUARY 2009. HOWEVER, MY INSURANCE COMPANY DOES NOT WANT TO PAY FOR THE NEW TRANSMISSION BECAUSE THEY STATE THE REPAIRS FROM THE ACCIDENT $7,888.70, PLUS THE COST OF A NEW TRANSMISSION, AROUND 8K WILL BE MORE THAN THE VALUE OF THE CAR. SO, WHO SHOULD PAY FOR THIS NEW TRANSMISSION, THE DEALER, THE AUTO BODY SHOP (WHOM DID NO WORK ON THE TRANSMISSION, SEEMINGLY) OR ME? HOW DO I KNOW, THIS IS NOT JUST ANOTHER BAD TRANSMISSION? THERE IS NO WAY TO TELL ON A MINI COOPER (NO WAY TO CHECK) TRANSMISSION FLUID AND NO INDICATOR LIGHT CAME ON. *TR

- TL*THE CONTACT OWNS A 2006 MINI COOPER. THE CONTACT STATED THAT WHILE PUTTING THE VEHICLE IN REVERSE OR DRIVE, IT WOULD SUDDENLY LUNGE BACKWARD OR FORWARD WITHOUT WARNING. THE FAILURE OCCURRED NUMEROUS TIMES SINCE 2009. THE VEHICLE WAS INSPECTED BY ORLANDO MINI IN WHO ADVISED HER THAT SHE NEEDED TO REPLACE THE TRANSMISSION. THE VEHICLE HAD NOT BEEN REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 13,000. UPDATED 03/24/11*LJ THE CONSUMER STATED THE FAULTY TRANSMISSION CAUSED THE VEHICLE TO LUNGE FORWARD AND BACKWARD. UPDATED 04/04/11

- I HAD HAD MY CAR FOR A WEEK AFTER GETTING IT BACK AFTER A VERY EXPENSIVE TRANSMISSION REPLACEMENT WHEN I WAS DRIVING IT AND TRIED TO TURN ONTO THE HIGHWAY. IT WAS EXTREMELY DIFFICULT TO MAKE THE TURN AND I NARROWLY AVOIDED ENDING UP IN THE BAR DITCH. UPON, GETTING MY VEHICLE TO TOWN I IMMEDIATELY TOOK IT TO A MECHANIC. MY POWER STEERING HAS FAILED AND I WILL PROBABLY BE REPLACING THE WHOLE SYSTEM AT A THOUSAND DOLLARS OR MORE. AFTER PAYING 6500+ FOR A TRANSMISSION THAT WENT OUT THROUGH NO FAULT OF MY OWN, YOU CAN IMAGINE MY DISAPPOINTMENT AND FRANKLY, MY DISGUST. I CALLED THE CLOSES MINI COOPER DEALERSHIP (ABOUT 400 MILES AWAY) THEY OFFERED NO HELPFUL INFORMATION AND NEGLECTED ANY MENTION OF THE NUMEROUS PROBLEMS WITH THIS COMPONENT, THE CURRENT INVESTIGATION, AND THE CLASS ACTION LAWSUIT THAT WAS FILED LAST FALL. I FOUND ALL THAT OUT THROUGH MY OWN RESEARCH ON THE INTERNET. OBVIOUSLY, I HAVE NOT REPAIRED THIS YET BECAUSE I DON'T KNOW HOW I CAN.

- I BOUGHT MY MINI COOPER TWO MONTHS AGO. IT IS A 2006 MODEL. I WAS DRIVING HOME ON THE NIGHT OF THURSDAY JANUARY 7TH WHEN I HEARD A LOUD CLUNK. I LIVE ON A CALICHE ROAD SO

NATURALLY, I THOUGHT I HAD KICKED UP A ROCK OR CLUNK OF DIRT AND IT HIT THE BODY OF MY CAR. THE NEXT MORNING I HEADED OUT TO GO TO CLASS AND LESS THAN 5 MILES (I LIVE OUTSIDE OF TOWN 30 MILES, SO YES I DO A LOT OF DRIVING, BUT MY 2004 HYUNDAI SONATA HANDLED IT FOR OVER 2 YEARS AND WHEN I FIRST ACQUIRED IT HAD 145,000 MILES AND WHEN I FINISHED 198,000 AND WAS STILL RUNNING FINE) DOWN THE ROAD I BRAKED TO TURN ONTO A DIFFERENT ROAD AND AFTER COMPLETING THE TURN I PRESSED THE GAS PEDAL, THE ENGINE ROARED THE TACHOMETER SPRUNG UP, BUT THE CAR DIDN'T MOVE. THE MECHANIC I TOOK IT TO CONFIRMED THAT MY TRANSMISSION IS SHOT, NO DOUBT ABOUT, HOWEVER HE CANNOT TELL ME EXACTLY WHAT IS WRONG WITH IT WITHOUT TAKING OUT MY TRANSMISSION AND LOOKING AT THE INSIDE AS THAT IS WHERE THE SOURCE OF THE FAILURE ORIGINATES. IT IS AN INTERNAL DEFECT THAT CONSUMERS HAVE NO CONTROL OVER. *TR

**Internet Postings:**

- Add me to the list of disgusted Mini owners. Mine's a 2007 convertible with CVT transmission, 71k miles. The car started making a whining noise Monday and today I was told by an independent mechanic that it needs a new $5300 tranny. Tonight I had decided to take it to the Mini dealer and pitch a fit to get them to cover the repair. However it sounds like from all the previous posts, that will not help. I guess I will have it repaired and trade it. I have loved the car, but this has "taken the shine" off of it. FYI – 2007 and 2008 convertibles are 1st generation Minis, 2009 to now are 2nd generation.

- Hi, I have a 2007 Mini Cooper S convertible with automatic transmission, several days ago the transmission began to fail, make very abrupt changes between 2nd and 3rd, so leading to the MINI shop and they told me it was the "Transmission Control unit" or I had to change the complete transmission, someone has changed the oil? MINI in the workshop because I was told that was for life, someone has fixed this problem?

- I have a 2008 Mini Conv. with the CVT transmission that just failed with 36,400 miles on it. I did not use the dealer for the scheduled service plan and because of this they are not honoring the warrantee..For all the BS emails Mini sends to customers you would think they would send service reminders if they know their transmissions suck and will fail without a tranny fluid change at 18,000 miles. Obviously this is a company with no integrity at all!

- I have a 2008 S with 23,000 mi. on it. 2 months ago I had a transmission problem and am now wondering if it is leading to the failure. On starting, I put the gear in reverse and heard a loud clunk. Then the clunk happened when I put it in 1st each time. The car wouldn't go faster than 25mph with the engine racing like it's going to blow up. I think the car wouldn't shift out of 1st and the engine just raced. The

engine and transmission lights went on. The dealer just reset the warning lights and gave me the car back. One month later it did it again although after about 10 minutes it came out of it and started to shift again. Today my engine light came on and wouldn't go off so my car is in the dealership.

- I have a 2003 MINI w/ a CVT that went out at 78,000, out of warranty. I contacted MINI directly and the rep said he had not heard of anyone with this problem! I informed him that many people have experienced the same problem and he basically said there is nothing they could/would do about it since it was out of warranty. Not only does a new tranny cost $5300 from the factory, they don't even make the parts to rebuild it!!! Although you can buy a rebuilt from the factory... how is this possible or fair??? It took my mechanic 12hrs to remove it (factor in those labor costs plus labor to reinstall!) and attempted to find exactly what parts were needed, which is when he discovered that they don't even sell the parts needed to fix it! How RIDICULOUS is that?! ...This car has put me in financial ruin! It was my only transportation option so I was forced to take cabs to work, costing me around $1500/mo. After months of being late on all my bills and nearly avoiding an eviction, I was able to save up for a cheap car to get me around until I could save up enough to get it fixed, still saving up. I don't understand why BMW/MINI is not even acknowledging this and is doing absolutely nothing to remedy a problem of this magnitude since is affecting so many people. And they are supposed to be a luxury car company? Why haven't they recalled this transmission yet?

- My 2004 Cooper transmission died on me 2 years ago, with absolutely no warning! I had 80k miles on it.  I was heartbroken when i found out that it would cost me almost $7,000 to replace. I had to take a $5,000 loan from a family member to get a new one installed. When I spoke to the powers that be at Mini USA, they said they would contact my dealer and look into it. I was given no resolution… only that I could defer a few payments due to my expense, but still had to come up with a monthy car payment anyway. I am outraged and in the process of getting a lawyer. I love BMW and loved my Mini, but I will never buy another Mini again. I do feel like the CVT should have been recalled and I will stop at nothing to get reimbursed for my expenses. I still owe a fortune on this car. If anyone else has an 04 mini with this problem, I'd love to hear your story. I understand the CVTs are no longer being used. It would be nice if BMW would just own up to their mistakes.

- 2003 mini shut down on me going up a hill !!!! what a problem that coud have been. I bought my mini new and have had the engine light on forever even after i leave the dealership it flashes back on….but, the popping noise and just not moving blew me doors off!!!!! today i did some research and to my disappointment have seen that not only did my trans blow but everyone else will face this problem real soon…..mini usa your company needs to be the bigger guy and help out your customers and stop feeding bmw's fat pocket book!!!!!!!!!!!

66.    The CVT Defect poses an unreasonable safety risk for Class Members, as well

as the drivers, passengers, and pedestrians sharing the road with Class Vehicles.  A vehicle's

ability to have forward propulsion, not to stall, not to surge, and the ability of a vehicle's transmission to perform properly are each critical to the safe operation of a motor vehicle.  A defect that causes one or more of these negative characteristics clearly poses a safety hazard to the general public, and increases the risk of automobile accidents.

**B.**     **Defendants Have Exclusive Knowledge of the CVT Defect**

67.     Defendants have superior and exclusive knowledge of the CVT Defect, and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members prior to their purchase or lease of the Class Vehicles.

68.     Only Defendants had access to information about the defects of the CVTs used in the Class Vehicles through their dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data, among other internal sources of aggregate information about the problem.

69.     Starting in November 2004, Defendants issued the first of several technical service bulletins ("TSB") to only their dealers acknowledging the CVT Defect for Class Vehicles.  In these TSBs, Defendants implemented a variety of cheaper, albeit temporary, fixes instead of replacing the defective CVTs.

70.     The existence of the CVT Defect is a fact that would be considered material by a reasonable consumer deciding whether to purchase or lease a vehicle that was equipped with a CVT transmission.  Had Plaintiffs and other Class Members known that the Class Vehicles were equipped with defective CVTs, they would not have purchased the Class Vehicles equipped with the CVTs or would have paid less for them.  Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects.  Plaintiffs and Class Members further expect and assume that Defendants will not sell or lease vehicles with known safety

defects, such as the CVT Defect, and will disclose any such defects to its consumers when it learns of them.  They do not expect Defendants to fail to disclose the CVT Defect to them, to continually deny the defect, and to charge them thousands of dollars to repair defective CVTs.

      C.      **BMW Has Actively Concealed the CVT Defect**

     71.    While Defendants have been fully aware of the CVT Defect in the Class Vehicles, they have actively concealed the existence and nature of the defect from Plaintiffs and Class Members at the time of purchase, lease, servicing, repair and thereafter. Specifically, defendants have failed to disclose or actively concealed at and after the time of purchase, lease, servicing, repair and thereafter:

        a.    any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the CVTs;

        b.    that the Class Vehicles, including their CVTs, were not in good in working order, were defective, and were not fit for their intended purposes; and

        c.    that the Class Vehicles and their CVTs were defective, despite the fact that they learned of such defects through consumer complaints, as well as through other internal sources, as early as 2002, if not before.

     72.    Defendants have caused Plaintiffs and Members of the Class to expend money at its dealerships to repair or replace the Class Vehicles' CVTs, despite Defendant's knowledge of the defect.

     73.    When consumers present the Class Vehicles to an authorized BMW dealer for repair of the CVTs, consumers are typically told that they must pay for the repair.  The cost of

repairing the CVTs ranges from approximately six to ten thousand dollars, which is about one-third to one-half of the purchase price of the Class Vehicles.

74.     To this day, defendants still have not notified Plaintiffs and the Class Members that the Class Vehicles suffer from a systemic defect that causes the CVTs to malfunction.

75.     Defendants have caused Plaintiffs and Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' CVTs, despite BMW's knowledge of the CVT Defect.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action individually, and on behalf of a nationwide class (excluding residents of the State of California or any individuals who purchased or leased a Class Vehicle in California), pursuant to Fed. R. Civ. Pr. P. 23(a), 23(b)(2), and/or 23(b)(3); specifically, the following Class and Sub-Class:

> Class:                          All persons or entities in the United States, except California, who are current or former owners and/or lessees of a Class Vehicle.

77.     In the alternative, if the Court finds that New Jersey law should not be uniformly applied to the claims of the proposed Class, Plaintiffs propose the following Sub-Classes (collectively, the "Statewide Sub-Classes" or the "Sub-Classes"):

> South Carolina Sub-Class:       All persons or entities in South Carolina who are current or former owners and/or lessees of a Class Vehicle.  The proposed South Carolina Sub-Class representative is Lynette Bourne-Miller.

> New Jersey Sub-Class:           All persons or entities in New Jersey who are current or former owners and/or lessees of a Class Vehicle.  The proposed New Jersey Sub-Class representative is Victor Ferrer.

> Kentucky Sub-Class:             All persons or entities in Kentucky who are current or former owners and/or lessees of a Class Vehicle.  The proposed Kentucky Sub-Class representative is Robert Hare.

Connecticut Sub-Class:       All persons or entities in Connecticut who are current or former owners and/or lessees of a Class Vehicle.  The proposed Connecticut Sub-Class representative is Paul Pugliese.

Illinois Sub-Class:       All persons or entities in Illinois who are current or former owners and/or lessees of a Class Vehicle.  The proposed Illinois Sub-Class representative is Darren Bailey.

78.       Excluded from the Class and Sub-Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case.  Plaintiffs reserve the right to modify the Class and Sub-Class definitions if discovery and/or further investigation reveal that they should be expanded or otherwise modified.

79.       <u>Numerosity</u>:  Upon information and belief, each of the classes is so numerous that joinder of all members is impracticable.  While the exact number and identities of individual Class Members are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes that tens of thousands of Class Vehicles have been sold and leased in the United States of America, and thousands of Class Vehicles have been sold or leased in New Jersey, South Carolina, Kentucky, Connecticut and Illinois.

80.       <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions or law and fact exist as to all Class Members.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to:

a.       Whether Class Vehicles suffer from defects relating to the CVT;

b.       Whether the defects relating to the CVT constitute an unreasonable

safety risk;

c.     Whether Defendants know about the defects relating to the CVT and, if so, how long Defendants have known of the defect;

d.     Whether the defective nature of the CVT constitutes a material fact;

e.     Whether Defendants have a duty to disclose the defective nature of the CVT to Plaintiffs and Class Members;

f.     Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

g.     Whether Defendants knew or reasonably should have known of the defects relating to the CVT before it sold and leased Class Vehicles to Class Members;

h.     Whether Defendants should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective CVT;

i.     Whether Defendants breached the express warranty for the Class Vehicles;

j.     Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective CVTs; and

k.     Whether Defendants breached the implied warranty of merchantability under South Carolina law, New Jersey law, Kentucky law, Connecticut law, or Illinois law;

      l.      Whether Defendants violated express warranty statutes under South Carolina law, New Jersey law, Kentucky law, Connecticut law, or Illinois law; and

      m.     Whether Defendants violated consumer protection statutes under South Carolina law, New Jersey law, Kentucky law, Connecticut law, or Illinois law.

81.   <u>Typicality</u>:  The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, purchased and leased a Class Vehicle designed, manufactured, distributed, sold, marketed, advertised, warranted and serviced by Defendants, and equipped with a CVT.  The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of replacing the defective CVT or have been left with a vehicle that does not function properly.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to all Class Members.

82.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

83.   <u>Superiority</u>:  Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective

remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATION OF THE
### NEW JERSEY CONSUMER FRAUD ACT

84.     Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

85.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against all Defendants.

86.     The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ."  N.J.S.A. 56:8-2.

87.     Plaintiffs and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family, or household use.

88.     Defendants engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the NJCFA.  Specifically, Defendants were aware that the Class Vehicles

suffered from a common defect from the time they were manufactured, resulting in transmission slips, loss of forward propulsion, significant delays in acceleration, loud noises coming from the CVT, and total transmission failure while driving the Class Vehicles, but purposefully failed to disclose this to Plaintiffs and Class Members during the purchase of the vehicle or thereafter.  Defendants failed to disclose the CVT Defect with the knowledge that many Class Members may not discover the CVT Defect until after the expiration of their warranties.  Moreover, when the CVT defect did manifest during the warranty period, Defendants would simply institute the temporary fixes such as reprogramming the vehicle's DME engine computer and/or readapting the CVT, when the only way to repair the CVT is to replace it with a non-defective part. Further, Defendants marketed these vehicles as being of superior quality when the Class Vehicles contained a known defect.  Finally, Defendants knowingly marketed and advertised the CVTs in the Class Vehicles as being superior to traditional transmissions in fuel economy and other respects, when Defendants knew that the CVTs were an unproven technology and knew that they contained a defect.

89.    Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  Because the determination to conceal the CVT Defect from Class Vehicle owners at the time of sale and thereafter was made solely by Defendants, it is currently unknown which employees of Defendants made such decisions or exactly when they were made.  However, upon information and belief, Defendants became aware of this defect through sources unavailable to the general public by early 2002 and made the decision to conceal the existence of the CVT Defect shortly thereafter.

90.    Defendants purposefully and knowingly failed to disclose the defect in the Class Vehicles in order to secure the sale of these vehicles at a premium price and also to mislead

owners during the limited warranty period to avoid having to perform their contractual duties under the warranty.

91.     Defendants did not fully and truthfully disclose to its customers the true nature of the inherent defect in the CVT, which was not readily discoverable until years later, sometimes after the warranty has expired.

92.     Defendants intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles and not have the defects remedied under warranty.

93.     As a result of Defendants' conduct, Plaintiffs and Class Members have suffered an ascertainable loss.  In addition to direct monetary losses which can be several thousands of dollars, Plaintiffs and Class Members have also suffered an ascertainable loss by receiving less than what was promised.

94.     A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class Members.  Had the defects in the CVT in the Class Vehicles been disclosed, consumers would not have purchased them, would have paid less for the Class Vehicles had they decided to purchase them, or would have presented their vehicles for replacement of the CVT under warranty.

**COUNT II**
**VIOLATION OF VARIOUS STATES'**
**CONSUMER PROTECTION STATUTES**

95.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

96.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Statewide Sub-Classes against all Defendants under the consumer protection statutes of the states in which they purchased the Class Vehicles.

97.     Plaintiffs and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family, or household use.

98.     Defendants engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the consumer protection statutes of the various states.   Specifically, Defendants were aware that the Class Vehicles suffered from a common defect resulting in transmission slips, loss of forward propulsion, significant delays in acceleration, loud noises coming from the CVT, and total transmission failure while driving the Class Vehicles, but purposefully failed to disclose this to Plaintiffs and Class Members during the purchase of the vehicle or thereafter.   Defendants failed to disclose the CVT Transmission Defect with the knowledge that many Class Members may not discover the CVT Defect until after the expiration of their warranties.   Further, Defendants marketed these luxury vehicles as being of superior quality when the Class Vehicles contained a known defect.   Finally, Defendants marketed and advertised the CVTs in the Class Vehicles as being superior to traditional transmissions in fuel economy and other respects.

99.     Defendants also engaged in unlawful conduct in violation of the consumer protection statutes of the various states by making knowing and intentional omissions. Defendants purposefully and knowingly failed to disclose the defect in the Class Vehicles in order to secure the sale of these vehicles at a premium price and also to mislead owners during the limited warranty period to avoid having to perform their contractual duties under the warranty.

100.     Defendants did not fully and truthfully disclose to its customers the true nature of the inherent defect in the CVTs, which was not readily discoverable until years later, sometimes after the warranty has expired.

101.     Defendants intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles and not have the defects remedied under warranty.

102.     As a result of Defendants' conduct, Plaintiffs and Class Members have suffered an ascertainable loss.  In addition to direct monetary losses which can be several thousands of dollars, Plaintiffs and Class Members have also suffered an ascertainable loss by receiving less than what was promised.

103.     A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class Members.  Had the defects in the CVTs in the Class Vehicles been disclosed, consumers would not have purchased them, would have paid less for the Class Vehicles had they decided to purchase them, would have performed the necessary maintenance on the CVT, or would have presented their vehicles for repair of the CVT Defect under warranty.

104.     The South Carolina Sub-Class:  Defendant's practices, as alleged, were and are in violation of S.C. Code Laws §§ 39-5-10, *et seq.*

105.     The New Jersey Sub-Class:  Defendant's practices, as alleged, were and are in violation of N.J. Stat. Ann. §§ 57-12-1, *et seq.*

106.     The Kentucky Sub-Class:  Defendant's practices, as alleged, were and are in violation of KY. Rev. Stat. §§ 367.110, *et seq.;*

107.     The Connecticut Sub-Class:  Defendant's practices, as alleged, were and are in

violation of Conn. Gen Stat. §§ 42-110b, *et seq.*

108.    <u>The Illinois Sub-Class</u>:   Defendant's practices, as alleged, were and are in violation of 815 Ill. Comp. Stat. §§ 505/1, *et seq.;*

**COUNT III**

**BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301 *ET SEQ.***

109.    Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

110.    Plaintiffs and the other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

111.    Defendants are a "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4)-(5).

112.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

113.    Defendants' express warranty is a "written warranty" within the meaning of 1515 U.S.C. § 2301(6).

114.    Defendants breached the express warranty by:

    a.    Extending a 4-year/50,000-mile New Vehicle Limited Warranty ("NVL Warranty"), and in some cases, an extended warranty, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    b.    Selling and leasing Class Vehicles with CVTs that were defective in material and workmanship, requiring repair or replacement within the warranty period; and

   c.  Refusing to honor the express warranty by repairing or replacing, free of charge, the CVTs and instead providing temporary fixes designed to mask the CVT defect during the NVL warranty and then charging for repair and replacement parts when the NVL warranty expired.

115.   Defendants' breach of the express warranty deprived the Plaintiffs and the other Class Members of the benefits of their bargains.

116.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

117.   Defendants have been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other Class Members brought their vehicles in for diagnoses and repair of the CVT.

118.   As a direct and proximate result of Defendants' breach of written warranty, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiffs and Class Members who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**

119.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

120.    Plaintiffs bring this action on behalf of themselves and on behalf of the Class, or in the alternative on behalf of the Statewide Sub-Classes under the express warranty statutes of the states in which they purchased the Class Vehicles.

121.    Defendants expressly warranted that the Class Vehicles were of high quality and, at a minimum, would actually work properly.  Defendants also expressly warranted that they would repair and/or replace defects in material and/or workmanship free of charge if they manifested during the NVL Warranty period.

122.    Defendants breached this warranty by selling to Plaintiffs and Class Members the Class Vehicles with known defects, including but not limited to the defective CVT.

123.    Defendants further breached this warranty by failing to repair and/or replace Plaintiffs' and other putative Class Members' CVT.

124.    For instance, Plaintiff Bourne-Miller presented her vehicle to an authorized service center while still covered under the express warranty on two separate occasions complaining of transmission problems.  Despite that, Defendants refused to honor the warranty and repair the damage caused by the CVT Defect free of charge.   Instead, Defendants implemented temporary fixes designed to mask the CVT Defect until after Plaintiff's 4 years/50,000 miles express Warranty had expired, thereby shifting the burden of repair to the plaintiff.

125.    Defendants knew of the aforesaid defects by 2002, if not before, and continues to have knowledge of the CVT Defect and breaches of its express warranty, yet they have intentionally failed to notify Plaintiff and Class Members.

126.    This intended failure to disclose the known CVT Defect is malicious, and was carried out with willful and wanton disregard for the rights and economic interests of Plaintiff

and Class Members.

127.     As a result of Defendants' actions, Plaintiffs and Class Members have suffered economic damages including but not limited to costly repairs, loss of use of the vehicles, substantial loss in value and resale value of the vehicles, and other damage.

128.     Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect and purposefully concealed the defect until such time that the Class Vehicles were out of warranty.  Further, even when the defect manifested during the warranty period, as was the case with Plaintiffs, Defendants refused to properly repair the vehicle under warranty.

129.     The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and Class Members.  Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.  This disparity led to plaintiffs having no choice but to accept a warranty on their CVT that was significantly lower than the many other vehicles on the market.  In fact, many vehicles sold by other manufacturers come with powertrain warranties that range from 5 years/60,000 miles to 10 years/120,000 miles.

130.     Plaintiffs and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of

Defendants conduct described herein.

131.    The South Carolina Sub-Class: Defendants' practices, as alleged, were and are in violation of S.C. §§ 36-2-313.

132.    The New Jersey Sub-Class: Defendants' practices, as alleged, were and are in violation of N.J. Stat. ATM. 12A:2-313.

133.    The Kentucky Sub-Class: Defendants' practices, as alleged, were and are in violation of Ken. Rev. Stat. §§ 355.2-313.

134.    The Connecticut Sub-Class: Defendants' practices, as alleged, were and are in violation of Conn. Gen. Stat. Ann. §§ 42a-2-313.

135.    The Illinois Sub-Class: Defendants' practices, as alleged, were and are in violation of 810 Ill. Comp. Stat 512-313.

**COUNT V**
**BREACH OF THE IMPLIED**
**WARRANTY OF MERCHANTABILITY**

136.    Plaintiffs and the Classes incorporate by reference each proceeding and succeeding paragraph as though fully set forth at length herein.

137.    Plaintiffs bring this action on behalf of themselves and on behalf of the Class, or in the alternative on behalf of the Statewide Sub-Classes under the implied warranty statutes of the states in which they purchased the Class Vehicles.

138.    Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

139.    The Class Vehicles are "goods" as defined under the UCC.

140.    Defendants impliedly warranted that the Class Vehicles were of a merchantable quality.

141.    Defendants breached the implied warranty of merchantability, as the Class

Vehicles were not of a merchantable quality at the time of sale and thereafter due to the CVT Defect, and the associated problems caused by this defect.  Specifically, the CVT Defect can cause transmission slips, loss of forward propulsion, significant delays in acceleration, loud noises coming from the CVT, and total transmission failure while driving.

142.    As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured, and are entitled to damages.

143.    Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect and actively concealed the defect from Class Members in order to allow the applicable warranty period to run.

144.    The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and Class Members.  Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and that the CVT Transmission would fail well before their useful lives.

145.    Plaintiffs and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

146.    The South Carolina Sub-Class: Defendant's practices, as alleged, were and are in violation of S.C. §§ 36-2-314.

147.   <u>The New Jersey Sub-Class:</u> Defendant's practices, as alleged, were and are in violation of N.J. Stat. ATM. 12A:2-314.

148.   <u>The Kentucky Sub-Class</u>: Defendant's practices, as alleged, were and are in violation of Ken. Rev. Stat. §§ 355.2-314.

149.   <u>The Connecticut Sub-Class</u>: Defendant's practices, as alleged, were and are in violation of Conn. Gen. Stat. Ann. §§ 42a-2-314.

150.   <u>The Illinois Sub-Class</u>: Defendant's practices, as alleged, were and are in violation of 810 ILCS 512-314.

<b>COUNT VI<br>COMMON LAW FRAUD</b>

151.   Plaintiffs and the Classes incorporate by reference each proceeding and succeeding paragraph as though fully set forth at length herein.

152.   Plaintiffs bring this action on behalf of themselves and on behalf of the Class, or in the alternative on behalf of the Statewide Sub-Classes.

153.   Defendants made material misrepresentations and omissions concerning a presently existing or past fact.  For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent defect with the CVT in the Class Vehicles, which was not readily discoverable until years later, sometimes after the warranty has expired.  As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defects and all of the resultant problems, and also not present their vehicles to an authorized repair facility during the warranty period to have the defect remedied at no cost.

154.   These omissions and statements were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs and Class Members rely on them.

155.    Plaintiffs and Class Members reasonably relied on these statements and omissions, and suffered damages as a result.

<u>COUNT VII</u><br><b>BREACH OF THE DUTY OF GOOD FAITH<br>AND FAIR DEALING</b>

156.    Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

157.    Plaintiffs bring this action on behalf of themselves and on behalf of the Class, or in the alternative on behalf of the Statewide Sub-Classes.

158.    Every contract in New Jersey contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

159.    Here the NVL warranty provided by Defendants was a contract between the parties.

160.    Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiff and Class Members of the CVT Defect in the Class Vehicles, and failing to fully and properly repair this defect.

161.    Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and Class Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

<u>COUNT VIII</u><br><b>UNJUST ENRICHMENT</b>

162.    Plaintiff and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

163.    Plaintiffs bring this action on behalf of themselves and on behalf of the Class, or

Page | 40

in the alternative on behalf of the Statewide Sub-Classes.

164.    As a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations regarding known defects and the scope of the Warranty coverage in the Class Vehicles, Defendants have profited through the sale and lease of said vehicles.  Although these vehicles are purchased through Defendants' authorized dealers, the money from the vehicle sales flows directly back to Defendants.

165.    Additionally, as a direct and proximate result of defendants' failure to disclose known defects and material misrepresentations regarding known defects in the Class Vehicles, Plaintiffs and members of the Class Members have incurred substantial costs to repair the defects and therefore have conferred an unjust substantial benefit upon Defendants.

166.    Moreover, as a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations regarding known defects in the Class Vehicles, Defendants have profited to the extent that Plaintiffs and Class Members purchased and leased Defendants' vehicles, purchased certified BMW parts directly from the Defendants to repair the defects, and had to pay for repairs out of their own pocket that should have been covered under warranty.

167.    Defendants have therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to defendants' profits when said money should have remained with Plaintiffs and Class Members.

168.    As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

## COUNT IX
### INJUNCTIVE RELIEF

179.    Plaintiffs and the Classes incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

180.    Injunctive relief is appropriate and necessary to remedy Defendants' wrongful conduct and to prevent the wrongful conduct from continuing.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that this Court:

a.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

b.    Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

c.    Award all actual, general, special, incidental, statutory, treble, punitive, and consequential damages to which Plaintiffs and Class Members are entitled;

d.    Award pre-judgment and post-judgment interest on such monetary relief;

e.    Award injunctive relief is appropriate and necessary to remedy Defendants' wrongful conduct and to prevent the wrongful conduct from continuing; and

f.    Award all other relief deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

Dated:  February 13, 2012

By: _____

Matthew Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:  (973) 228-9898
Facsimile: (973) 228-0303
e-mail: mmendelsohn@mskf.net
e-mail: dmazie@mskf.net

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

I hereby further certify that to the best of my knowledge, the matter in controversy is the subject of three other actions pending in United States District Court, Central District of California, entitled <u>Aarons v. BMW of North America</u>, LLC Case No. CV-11-07667 PSG (CWX); <u>Limon v. BMW of North America, LLC</u>, No. 11-cv-01952-CJC (C.D. Cal., filed Dec. 16,2011); and <u>Kollmer v. BMW of North America LLC</u>, No. 11-cv-10444-JAK (C.D. Cal., filed Dec. 19, 21 2011)  However, these matters have been brought on behalf of  California-only classes, while the instant case involves a nationwide class and excludes those Class Members who reside in or purchased their vehicles in California.

**MAZIE SLATER KATZ & FREEMAN, LLC**
Attorneys for Plaintiffs

_____
MATTHEW R. MENDELSOHN

Dated:  February 13, 2012